## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 19-00730-JNC |
| CAH ACQUISITION COMPANY #1, LLC, d/b/a WASHINGTON COUNTY COMMUNITY HOSPITAL | CHAPTER 11 |
| | Adv. Pro. No. _____ |
| THOMAS W. WALDREP, JR., as Litigation Trustee, | |
| Plaintiff, | |
| v. | |
| JONATHAN R. BRONISTE, | |
| Defendant. | |

## **COMPLAINT**

Thomas W. Waldrep, Jr., in his capacity as Litigation Trustee in the above-captioned case, complains against Defendant Jonathan R. Broniste as follows:

### NATURE OF THE ACTION

1.      Defendant conspired with and facilitated the fraud of the perpetrators of two coordinated schemes to generate fraudulent reimbursements for laboratory tests at a number of rural hospitals located in multiple states.  The schemes—which generated massive amounts in fraudulent billings—defrauded third-party payors, private insurers, patients, and ultimately hospitals, like the above-captioned Debtor, which were utilized as instrumentalities in those schemes.

2.      The schemes, in essence, were straightforward: managers for the hospitals caused the hospitals to enter into arrangements with third-party laboratory testing companies.  Pursuant to those arrangements, the laboratory testing companies obtained samples from physicians

throughout the country, including Defendant, none of whom had received treatment from the hospitals or had any connection to the hospitals whatsoever. The parties would then bill those tests to private insurers as if they had been conducted at the hospitals themselves for patients of those hospitals. Doing so allowed the hospitals to charge private insurers higher, "in-network" reimbursement rates for procedures that were, in reality, out-of-network and should have been reimbursed, if at all, at much lower rates.

3.      As stated, in addition to defrauding private insurers, the schemes also constituted a fraud on the hospitals. Rather than turning the proceeds of the schemes over to the hospitals, the perpetrators pocketed much of the ill-gotten gains while exposing the hospitals to massive liability and jeopardizing their relationships with the private insurers on whose reimbursements the hospitals depended to maintain their operations.

4.      Ultimately, the schemes destroyed the hospitals, the Debtor being no exception. When it was uncovered, the private insurers targeted by the scheme began heavily scrutinizing the hospitals' claims, and, in some instances, stopped doing business with the hospitals entirely. The Debtor and its affiliated hospitals were forced to file for bankruptcy, and some have ceased operation. As a result, rural communities have been deprived of the health care services, and associated jobs, that they desperately need.

5.      The Litigation Trustee thus brings this adversary proceeding, which asserts claims for facilitating fraud and civil conspiracy to rectify the harm that Defendant caused the Debtor's business.

## JURISDICTION AND VENUE

6.      This Adversary Proceeding arises from and relates to the above-captioned bankruptcy case (the "Bankruptcy Case").

7.      This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157(b)(2) and 1334.

8.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      This is both a core and non-core proceeding pursuant to 28 U.S.C. § 157.

10.     The Plaintiff consents to this Court determining the cause and entering final judgment thereon.

## THE PARTIES

11.     Plaintiff, Thomas W. Waldrep, Jr., is the Litigation Trustee of CAH Acquisition Company #1, LLC, d/b/a Washington County Community Hospital ("CAH 1" or "Washington County Hospital") and its affiliates (collectively, the "Hospitals") in jointly administered cases proceeding before the United States Bankruptcy Court for the Eastern District of North Carolina.

12.     Upon information and belief, Defendant Jonathan R. Broniste is a citizen and domiciliary of Arkansas.

## FACTUAL BACKGROUND

### I.      Critical Access Hospitals and the Debtor

13.     The Balanced Budget Act of 1997, Pub. Law. 105-33, created a new category of hospitals, known as critical access hospitals ("CAH").  Hospitals qualify for the CAH program by meeting certain regulatory requirements promulgated by the Centers for Medicare & Medicaid Services ("CMS"), including that the hospital: (1) is located in a rural area; (2) provides 24-hour emergency services seven days a week; (3) has 25 or fewer inpatient beds also used for swing bed services; and (4) has an annual average acute inpatient stay length of 96 hours or less.

14.     Congress created the CAH program to address a string of rural hospital closures and a concern about the ongoing financial viability of rural hospitals.  The program is designed to

ensure the continued viability of rural hospitals, which provide life-saving medical treatment and needed jobs to underserved communities.

15.     To further that goal, CAHs are reimbursed by insurance companies at much higher rates than other hospitals—typically 101 percent of reasonable costs—for most inpatient and outpatient services, including certain laboratory testing procedures.

16.     The Debtor and its affiliates, certain of which are also debtors before this Court, owned and operated a number of for-profit, critical access hospitals (collectively, the "Hospitals") that provided acute care, swing bed, emergency medicine, imaging, rehabilitation, laboratory, and related outpatient ancillary services in small rural areas in North Carolina, Kansas, Missouri, and Oklahoma.  Each of the Hospitals is classified as a CAH or was classified as a CAH before it ceased operations.

17.     In addition to their status as CAHs for purposes of federal reimbursements, each of the Hospitals entered into contractual agreements with certain private insurers (the "Private Insurers"), pursuant to which the Hospitals would be designated as "in-network" providers.  In-network providers are reimbursed for qualifying medical services and qualifying patients at higher rates than other, "out-of-network" providers.

**II.     The Billing Schemes**

18.     At all relevant times, Paul Nusbaum ("Nusbaum" and Steve White ("White") were co-owners of HMC/CAH Consolidated, Inc.  ("HMC/CAH").

19.     HMC/CAH owned 100% of the member and shareholder interests in the Debtor and the other Hospitals.

20.     Through HMC/CAH, Nusbaum and White were in a position of superiority over, and exercised control over, the Debtor and the other Hospitals.

21.     At all relevant times, Nusbaum and White were co-owners of Rural Community Hospitals of America ("RCHA"), which in turn was the manager for the Debtor and other Hospitals.

22.     In or around late 2015, RCHA, Nusbaum, and White directed the Debtor and certain affiliated hospitals to enter into the first of two billing schemes—aimed at enriching themselves at the expense of the government, Private Insurers, and, ultimately, the Hospitals themselves (the "Verifi Scheme").  The Verifi Scheme sought to take advantage of the higher reimbursement rates that the Hospitals received from the Private Insurers in light of their status as "in-network" providers.

23.     In furtherance of that scheme, in or around June 2016, RCHA, Nusbaum, and White directed the Debtor to enter into an arrangement with a hospital laboratory management company, LGMG, LLC, d/b/a Verifi Labs ("Verifi"), to dramatically increase the billings that the Hospitals would generate for performing certain laboratory tests, including urine analysis and blood testing to detect the presence of alcohol or illegal drugs.

24.     The Verifi Scheme required the participation of third parties.  Under the Verifi Scheme, marketing companies were retained (the "Marketers") to enter into agreements with physicians throughout the country, including Defendant, to collect patient samples for urine analysis and blood testing (the "Physicians").  In accordance with their agreement, the Physicians, including Defendant, sent patient samples to Verifi for processing.

25.     Virtually all the patients whose samples were sent to Verifi by the Physicians had not received treatment at any of the Hospitals and had never visited any of the Hospitals.  In many instances, these patients did not even reside in a state where any of the Hospitals were located.

5

26.     After the tests were performed (by Verifi and its staff), claims for reimbursement would be submitted to the Private Insurers under the Hospitals' billing credentials, even though in many cases: (1) the Hospitals had not performed the tests; and (2) the patients whose blood or urine was tested did not receive treatment and had no connection to the Hospitals.

27.     Submitting the tests under the Hospitals' billing credentials allowed the scheme participants to claim reimbursement for "in-network" services at the higher rates afforded CAHs—rates that would not have been available had the tests been submitted under the billing credentials of the laboratories where the tests were actually performed.

28.     The Verifi Scheme caused the Hospitals to immediately and dramatically increase the claims that they submitted to the Private Insurers for reimbursement and associated revenue.

29.     In particular, the Debtor's monthly lab department revenue went from $116,325.00 in July 2016 to more than $580,000 the following month, then more than $1.2 million by January 2017.

30.     In the following months of the Verifi Scheme (February 2017 – July 2017), the Debtor, a rural hospital with only 25 beds, recognized monthly revenue of $853,994.57, $1,256,093.56, $1,311,199.34, $1,185,032.94, $2,120,012.94, and $1,023,015.81 (respectively) for lab work allegedly performed by the hospital – most of which was actually performed by Verifi, using Verifi's equipment, staff, and facilities.

31.     Unfortunately, while increasing the Hospitals' purported revenue, little to any of this money actually made its way into the Hospitals' coffers.  Rather, the proceeds from the Verifi Scheme were transferred to the various scheme participants, leaving the Hospitals with nothing but liability to defrauded third parties.

32.     Upon information and belief, the Debtor was insolvent on the date that the Verifi Scheme began and remained insolvent from that date through the filing of this chapter 11 case.

33.     Unfortunately for the schemers, as the volume of the Hospitals' reimbursements skyrocketed, the Hospitals began facing increasing scrutiny from the Private Insurers.

34.     Certain of the Private Insurers began requiring additional documentation and/or additional review before approving claims relating to laboratory testing.  This increased scrutiny impeded the Hospitals' ability to carry out their day-to-day functions, including providing care and obtaining reimbursement for legitimate patients and legitimate medical treatment.

35.     Along these lines, on March 14, 2017, Terry Amstutz, the Chief Executive Officer for the Debtor, wrote Nusbaum and others informing them that Aetna would no longer reimburse the Debtor for its "outreach" labs performed by Verifi Labs.  In particular, Aetna advised that the submitted lab claims were "improper" and "constitute[d] a pattern of abusive billing and [gave] rise to a reasonable suspicion of fraud."

**III.     The Empower Scheme**

36.     In late 2016, RHCA, Nusbaum, and White began a campaign to part with Verifi and join forces with Jorge A. Perez ("Perez") and his company, EmpowerHMS ("Empower"), to utilize the Debtor (and other Hospitals) in a massive fraudulent billing scheme (the "Empower Scheme") (collectively with the Verifi Scheme, the "Billing Schemes").

37.     On or about March 29, 2017, Nusbaum and White executed a so-called Conversion Agreement, whereby the Hospitals' former corporate parent "sold" 80% of its ownership interests in the Hospitals to Health Acquisition Company LLC ("HAC"), a special purpose entity formed by Nusbaum and White for their ownership in HMC/CAH, in exchange for a release of outstanding debt owed to HAC under a prior loan agreement.

38.     At the same time, Nusbaum, White, and HAC brought in Perez, Empower, and the Perez Group to implement the Empower Scheme.  Immediately thereafter, on April 20, 2017, Nusbaum and White sold Perez (along with Ricardo Perez and Carlos Perez) 50% of HAC.

39.     The Empower Scheme, amazingly, was even worse for the Hospitals.  At least under the Verifi Scheme, some revenue was running through the Debtor and its affiliated hospitals— though the vast majority was immediately transferred to Verifi and other scheme participants.

40.     Under the Empower Scheme, however, Empower H.I.S. (an Empower affiliate), was granted complete control over the operations of each of the Hospitals, including control over their bank accounts, billing systems, and their rights to submit claims to insurance companies with which the Hospitals had "in-network" contracts.  Along these lines, on April 20, 2017, RCHA, Nusbaum, and White bestowed Perez with the title of Primary Manger of HAC, and on August 3, 2017, as reflected in corporate minutes signed by Nusbaum, RHCA, Nusbaum, and White agreed that Perez would "be authorized to act on behalf of HAC and any/all of the individual hospital entities . . . on all matters relating to bank accounts and lending matters including relationships with all banks and government entities."

41.     Likewise, as part of the Empower Scheme, RHCA, Nusbaum, and White authorized Empower H.I.S. to install software at both the CAH Hospitals and the third-party laboratories participating in the Empower Scheme.  The software enabled their laboratories to transmit patient billing information and associated data by wire to Empower in Miami, Florida for the purpose of submitting insurance claims to insurers and other third-party payors.

42.     In doing so, Empower was able to pick and choose which Debtor to utilize for purposes of submitting its fraudulent laboratory billings.  As it relates to Washington County Hospital, lab director, Kari Hardison, began noting a curious daily occurrence.  Every night, she

would create a log of all the lab work performed by Washington County Hospital that day, creating hard copies of the related records.  When she would arrive at work the following day, however, numerous additional labs would appear in Washington County Hospital's electronic billing system – notwithstanding that Washington County Hospital's labs had been closed and hospital staff had not run any additional lab work overnight.

43.     As an additional issue, rather than revenue initially running to the Hospitals that had any involvement in related lab work (even if just for billing), the money was placed into a central slush fund maintained by Empower.  Upon information and belief, Perez would then cause Empower to make distributions from that account to himself and its other owners as well as other entities and individuals involved in the Empower Scheme.  By doing so, the majority of the revenue never even passed through the Debtor and its affiliated hospitals' financial records, only receiving what Perez and Empower chose to share.

44.     Like the Verifi Scheme, under the Empower Scheme, Physicians, including Defendant, agreed to send, and did in fact send, patient samples for urine analysis and blood testing to Empower for processing.

45.     Like the Verifi Scheme, under the Empower Scheme, virtually all the patients whose samples were sent to Empower by the Physicians had not received treatment at any of the Hospitals and had never visited any of the Hospitals.  In many instances, these patients did not even reside in a state where any of the Hospitals were located.

IV.        **The Billing Schemes Unravel**

46.        In August 2017, the Office of the Missouri State Auditor issued an audit report regarding one of the Hospitals involved in the Empower Scheme, Putnam County Hospital, in Unionville, Missouri (not one of the CAH Hospitals).[1]

47.        The State Auditor found that Putnam County Hospital had seen a "significant increase of questionable revenues from laboratory billings of health insurance companies" arising from "out-of-state patients for lab work not conducted in Putnam County."

48.        The State Auditor noted that hospital officials "have not provided sufficient support to justify why such activity is being billed through the hospital."  The State Auditor further noted that at least one private insurance company was no longer paying any claims for the hospital as a result of the Empower Scheme, and that "[c]ontinued use of such questionable laboratory billings could leave the hospital at risk if such activity is deemed to be inappropriate by the insurance companies billed . . . ."

49.        The State Auditor determined that the billings generated by Putnam County Hospital alone exceeded $90 million between December 2016 and May 2017, as compared to $12.7 million for all of fiscal year 2015, and $7.5 million for all of fiscal year 2016.

50.        The State Auditor noted that, while billings had exploded, little of that money was actually going to Putnam County Hospital.  Instead, 80 percent of the new revenues were disbursed to the laboratory companies (including those owned and operated by Perez), with an additional 6 percent going to the billing company and another portion going to out-of-state phlebotomists.

51.        Following the State Auditor's report, the Private Insurers filed lawsuits seeking to recover the amounts they paid the Debtor and the Hospitals for the fraudulent claims.

---

[1] A copy of the State Auditor's report can be found online at
https://auditor.mo.gov/Repository/Press/2017074829206.pdf (last accessed July 10, 2024).

52.     Some of the Private Insurers also terminated their relationships with the Hospitals, thereby depriving the Hospitals of a needed source of revenue.

53.     The uncovering of the Empower Scheme also drew the attention of the federal government.  On June 17, 2020, the United States Department of Justice indicted a number of participants in the Empower Scheme, including Perez, for crimes arising from actions related to the Empower Scheme, in a case captioned United States v. Jorge Perez, et al., 3:20-cr-86 (M.D. Fla.), relating to a similar scheme at a Florida hospital.  On June 27, 2022, a federal jury in the Middle District of Florida convicted Perez and Ricardo Perez of conspiracy to commit health care fraud and wire fraud, five counts of health care fraud, and conspiracy to commit money laundering.

**V.     The Hospitals' Bankruptcies**

54.     Ultimately, the Hospitals' participation in the Billing Schemes doomed the Debtor and its affiliated hospitals' businesses.  On February 19, 2019 (the "Petition Date"), Washington County, North Carolina, Medline Industries, Inc., and Dr. Robert Venable (collectively, the "Petitioning Creditors") filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against one of the CAH Hospitals, CAH Acquisition Company #1, LLC ("CAH 1", Case No. 19-00730).

55.     On March 15, 2019, the Debtor's bankruptcy case was converted from Chapter 7 to Chapter 11, and the Litigation Trustee was appointed as the Chapter 11 Trustee for the Debtor pursuant to Section 1104 of the Bankruptcy Code.

56.     In March and April 2019, six of the Debtor's affiliates, CAH Acquisition Company 2, LLC ("CAH 2", Case No. 19-01230), CAH Acquisition Company 3, LLC ("CAH 3", Case No. 19-01180), CAH Acquisition Company 6, LLC ("CAH 6", Case No. 19-01300), CAH Acquisition Company 7, LLC ("CAH 7", Case No. 19-01298), CAH Acquisition Company 12, LLC ("CAH

12", Case No. 19-01697), and CAH Acquisition Company 16, LLC ("CAH 16", Case No. 19-01227), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "Bankruptcy Cases").

57. On October 19, 2020, the Court entered an Order of Conversion in which CAH 6 was converted from a case under Chapter 11 to a Chapter 7 case.

58. On that same date, the Court confirmed the Debtor Amended Chapter 11 Plan of Orderly Liquidation (the "Washington Plan"). The Effective Date (as defined in the Washington Plan) occurred on November 3, 2020.

59. On December 7, 2020, the Court confirmed Chapter 11 plans for each of CAH 2, CAH 3, CAH 7, CAH 12, and CAH 16. The Effective Dates for each such plan (as defined in the respective plans) were: (i) December 22, 2020 for CAH 7 and CAH 12; and (ii) February 20, 2021 for CAH 2, CAH 3, and CAH 16. The Effective Date of each such plan converted those Chapter 11 estate into litigation trusts (each a "Litigation Trust", and altogether, the "Litigation Trusts").

60. Plaintiff is the Litigation Trustee under each of the above-mentioned plans, vested with the authority to pursue all claims on behalf of the Hospitals' bankruptcy estates.

61. On April 25, 2024, the Court entered an order extending the time for Plaintiff to pursue claims against physicians on behalf of the Debtor to and including July 31, 2024.

**VI.    Discovery of Defendant's Participation in the Billing Schemes**

62. On August 6, 2021, Plaintiff commenced adversary proceedings against Nusbaum, White, Perez, RCHA, and HAC as Litigation Trustee for the Hospitals for claims arising from the Billing Schemes (Adv. Pro. No. 21-00078-5-JNC) (the "N/W Adversary Proceedings").

63. Perez failed to appear, answer, or otherwise respond in the N/W Adversary Proceedings. Entries of default were entered against him.

12

64.    The trial of the N/W Adversary Proceedings against the remaining defendants is scheduled to begin on November 18, 2024.

65.    On June 30, 2023, Plaintiff, as Litigation Trustee in the N/W Adversary Proceedings, issued a subpoena to Waystar Technologies, Inc. f/k/a Zirmed Inc. ("Waystar") for claims data submitted under the Hospitals' credentials.

66.    On October 30, 2023, Plaintiff, as Litigation Trustee in the N/W Adversary Proceedings, issued a similar subpoena to Experian Health, Inc. ("Experian").

67.    Review of the claims data produced by Waystar and Experian identified Defendant as a participating Physician in the Billing Schemes.

68.    This claims data also includes information regarding the location (zip codes) of the individuals whom Defendant identified as patients in claims Defendant submitted for payment for laboratory services.  Attached as ***Exhibit A*** to this Complaint, incorporated herein by reference, is a map showing the locations of the patients, as identified by Defendant in the claims submitted.

69.    On or about April 4, 2024, Plaintiff sent a demand letter to Defendant (the "Demand Letter") outlining the Billing Schemes and the basis for Plaintiff's belief and information regarding Defendant's involvement in the schemes.  A copy of the Demand Letter is attached as ***Exhibit B*** to this Complaint and is incorporated herein by reference.

70.    To date, Defendant has failed to respond to the Demand Letter.

71.    Upon information and belief, between March 21, 2017 and June 27, 2017, Defendant submitted at least 572 claims for laboratory tests allegedly performed (or to be performed) by Washington County Hospital, totaling at least $104,092.00 in claims made, and resulting in at least $40,522.00 in payments to Washington County Hospital.

13

72.     Upon information and belief, these claims arose from 44 alleged separate encounters between Defendant and patients during that period, and all 44 of those encounters (or 100%) were limited to the provision of laboratory services only.

## COUNT I
## FACILITATING FRAUD

73.     Plaintiff realleges and incorporates paragraphs 1 through 71 as though set forth fully herein.

74.     Defendant agreed with Verifi, Empower, Perez, Nusbaum, White, RCHA and/or HAC to defraud the Private Insurers at the expense of the Debtor by submitting claims and/or tests to Verifi and/or Empower to be fraudulently billed through the Debtor.

75.     Verifi, Empower, Perez, Nusbaum, White, RCHA, and/or HAC committed overt tortious acts, including, but not limited to, breach of fiduciary duty, conversion, unfair and deceptive trade practices, fraud, and constructive fraud, by using the claims/tests submitted by Defendant to fraudulently bill Private Insurers through, and at the expense of, the Debtor.

76.     These overt tortious acts caused the Debtor significant damages, both in the form of payments made to participants in the Billing Schemes as well as loss of future profits resulting from insurers refusing payments on other work performed by the Debtor.

77.     Further, the lost income from insurers resulting from the overt tortious acts led to the Debtor's liquidity crisis, precluding its ability to continue operating and forcing its bankruptcy.

Wherefore, the Litigation Trustee requests entry of a final judgment for the benefit of the Litigation Trust against Defendant for facilitating fraud and awarding the Litigation Trust damages of no less than $40,522.00, and granting such further relief as is just and appropriate.

## COUNT II
## CIVIL CONSPIRACY

78.     Plaintiff realleges and incorporates paragraphs 1 through 76 as set forth fully herein.

79.     Defendant agreed with Verifi, Empower, Perez, Nusbaum, White, RCHA, and/or HAC to defraud the Private Insurers at the expense of the Debtor by submitting claims and/or tests to Verifi and/or Empower to be fraudulently billed through the Debtor.

80.     This agreement was to do unlawful acts or lawful acts in an unlawful way.

81.     Verifi, Empower, Perez, Nusbaum, White, and/or HAC committed overt acts in furtherance of the agreement by using the claims/tests submitted by Defendant to fraudulently bill Private Insurers through, and at the expense of, the Debtor.

82.     These acts caused the Debtor significant damages, both in the form of payments made to participants in the Billing Schemes as well as loss of future profits resulting from insurers refusing payments on other work performed by the Debtor.

83.     Further, the lost income from insurers resulting from the acts led to the Debtor's liquidity crisis, precluding its ability to continue operating and forcing its bankruptcy.

84.     Defendant and Verifi, Empower, Perez, Nusbaum, White, RCHA, and/or HAC acted pursuant to a common scheme.

Wherefore, the Litigation Trustee requests entry of a final judgment for the benefit of the Litigation Trust against Defendant for civil conspiracy and awarding the Litigation Trust damages of no less than $40,522.00, and granting such further relief as is just and appropriate.

Respectfully submitted, this the 25th day of July, 2024.

**WALDREP WALL BABCOCK**
**& BAILEY PLLC**

/s/ *Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (NC Bar No. 11135)
Kelly A. Cameron (NC Bar No. 55664)
Chris W. Haaf (NC Bar No. 46077)
James C. Lanik (NC Bar No. 30454)
Jennifer B. Lyday (NC Bar No. 39871)
370 Knollwood Street, Suite 600
Winston-Salem, North Carolina 27103
Telephone:  336.722.6300
Facsimile:  336.722.1993
Email: notice@waldrepwall.com


**MCDONALD HOPKINS LLC**
Micah E. Marcus (*specially appearing LR 83.1(e)*)
300 North LaSalle Street, Suite 1400
Chicago, IL 60654
Telephone: (312) 280-0111
Facsimile: (312) 280-8232
Email:  mmarcus@mcdonaldhopkins.com

*Attorneys for Plaintiff*

16





Zip (5 - digit)

# *Exhibit B*
Demand Letter



James C. Lanik
Direct Dial: (336) 930-7620
Email: jlanik@waldrepwall.com
*Also Admitted in Colorado and Virginia*

---

NCDRC Certified Superior Court Mediator | Board Certified in Business Bankruptcy by The American Board of Certification & NC State Bar

April 4, 2024

JONATHAN R. BRONISTE
603 SOUTH DIVISION STREET
LAVACA, AR 72941

RE:     **CAH Acquisition Company #1, LLC**

Dear Sir/Madam:

We represent Thomas W. Waldrep, Jr., who is the Litigation Trustee (the "Trustee") of CAH Acquisition Company #1, LLC, d/b/a Washington County Community Hospital, together with its affiliates (collectively, the "Debtors" or the "Hospitals") in jointly administered cases proceeding before the United States Bankruptcy Court for the Eastern District of North Carolina (the "Bankruptcy Cases").[41]

**The Billing Schemes**. In the Bankruptcy Cases, the Trustee has pursued remedies and damages, punitive and otherwise, under the Bankruptcy Code and other applicable law to rectify the harm caused to the Hospitals as a result of coordinated schemes to generate fraudulent reimbursements for laboratory tests.

The schemes, which generated massive amounts in fraudulent billings, were straightforward: Insiders and other fiduciaries of the Debtors caused the Hospitals to enter into arrangements with third-party laboratory testing companies. Pursuant to those arrangements, the laboratory testing companies obtained samples from patients throughout the country, none of whom had received treatment from the Hospitals or had any connection to the Hospitals whatsoever. The parties would then bill those tests as if they had been conducted at the Hospitals themselves for patients of those Hospitals. Doing so allowed the Hospitals to charge higher, in-network rates for procedures that were, in reality, out-of-network and should have been reimbursed, if at all, at much lower rates.

---

[41] The seven (7) underlying bankruptcy cases are styled as: *In re CAH Acquisition Company #1 , LLC, d/b/a Washington County Community Hospital*, Case No. 19-00730-5-JNC (Ch. 11) (Bankr. E.D.N.C); *In re CAH Acquisition Company #2 , LLC, d/b/a Oswego Community Hospital*, Case No. 19-01230-5-JNC (Ch. 11) (Bankr. E.D.N.C); *In re CAH Acquisition Company #3, LLC, d/b/a Horton Community Hospital*, Case No. 19-01180-5-JNC (Ch. 11) (Bankr. E.D.N.C); *In re CAH Acquisition Company 6, LLC, d/b/a I-70 Community Hospital*, Case No. 19-01300-5-JNC (Ch. 11) (Bankr. E.D.N.C); *In re CAH Acquisition Company 7, LLC, d/b/a Prague Community Hospital*, Case No. 19-01298-5-JNC (Ch. 11) (Bankr. E.D.N.C); *In re CAH Acquisition Company 12, LLC, d/b/a Fairfax Community Hospital*, Case No. 19-01697-5-JNC (Ch. 11) (Bankr. E.D.N.C); and *In re CAH Acquisition Company 16, LLC, d/b/a Haskell County Community Hospital*, Case No. 19-01227-5-JNC (Ch. 11) (Bankr. E.D.N.C). Pursuant to orders of the Bankruptcy Court, the debtors' cases are procedurally consolidated.



April 4, 2024
Page 2

Ultimately, the schemes destroyed the Hospitals.  When it was uncovered, the private insurers targeted by the scheme began heavily scrutinizing the Hospitals' claims and, in some instances, stopped doing business with the Hospitals entirely.  The Debtors were forced to file for bankruptcy, and some have ceased operation.  As a result, rural communities have been deprived of the health care services, and associated jobs, that they desperately need.

**Your Involvement**.  Upon information and belief, you have been identified through claims data, billing records, and other documentation as having participated in the fraudulent and illegal billing schemes outlined above.  To date, we have identified at least 572 claims / tests submitted by you, between 3/21/2017 and 6/27/2017, totaling at least $104,092.00 in claims made and at least $40,522.00 in payments to you.  To be clear, your liability for damages incurred as a result of your involvement in the schemes is not limited to the amounts received.

In addition, we have reason to believe that as a part of and in furtherance of the schemes, you received remuneration from those orchestrating and participating in the schemes outlined above, contrary to and in violation of applicable federal and state law, including, but not limited to, 42 U.S.C. § 1320a-7b(b) (Federal Anti-Kickback Statute), 42 U.S.C. § 1395nn (Federal Physician Self-Referral Law), and state laws prohibiting unfair and deceptive trade practices.

**The Trustee's Demand**.  Accordingly, the Trustee hereby demands payment in the amount of $36,469.80.  Failure to satisfy this demand on or before March 19, 2024, may result in the Trustee initiating legal proceedings in the United States Bankruptcy Court for the Eastern District of North Carolina to recover the damages incurred by the Hospitals on account of your participation in the billing schemes, together with reasonable attorneys' fees, exemplary or punitive damages, and all other remedies available to him under the Bankruptcy Code and applicable law.

**Litigation Hold and Preservation Demand**.   In light of the Trustee's demand and anticipated litigation involving you relating the billing schemes outlined above, you have an obligation to take reasonable steps to preserve and retain all hard copies and electronically stored information ("ESI"), as defined by Rule 34 of the Federal Rules of Civil Procedure, relevant to the matter and potential litigation of the Trustee's claims.  To fulfill this preservation obligation, you must take reasonable steps to preserve all hard copy documents and ESI relevant to this matter, including, but not limited to:

(a) Suspending all document and data destruction and backup tape recycling policies;
(b) Retaining software, hardware, or other information required to access or view the ESI;
(c) Taking special action for: (i) archived or deleted ESI; (ii) ESI stored in a database; and (iii) metadata, including the date ESI was created, the date ESI was last modified, and the name of the individual who created the ESI; and
(d) Taking any other reasonable steps necessary to prevent the destruction, loss, override, or modification of relevant data, either intentionally or inadvertently, such as through modification of your document retention policy and systems.



April 4, 2024
Page 3

      In short, all ESI must be preserved intact and without modification, and the above list is not exhaustive; you must preserve all information that is potentially relevant to this matter.

      **Reservation of Rights / No Waiver**.  This demand is made with full reservation of rights and the Trustee waives none of his rights, at law or in equity, by virtue of this demand or the parties' discussions relating thereto.  This communication may be viewed as an effort by the Trustee to collect a debt, and any information provided by you to the Trustee or to us will be used in the Trustee's efforts to collect the debt described above.

      Please direct all correspondence and questions regarding this demand to James C. Lanik.

Sincerely,

WALDREP, WALL, BABCOCK & BAILEY PLLC

/s/ JAMES C. LANIK

JAMES C. LANIK
Counsel for Thomas W. Waldrep, Jr., Litigation Trustee